UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NATIONAL PRODUCTS, INC.,

   Plaintiff,

   v.

PALMETTO WEST TRADING
COMPANY, LLC,

   Defendant.

CASE NO. C05-345JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' request for construction of the ten claim terms at issue in this patent infringement action. The court has reviewed the parties' briefing and supporting materials and has heard oral argument from the parties at a Markman hearing, held on April 17, 2006. This order memorializes the court's claim construction for the ten terms.

## II. BACKGROUND

Plaintiff National Products, Inc. ("NPI") brought this action against Defendant Palmetto West Trading Company, LLC ("Palmetto") for infringement of two patents issued in 2003. The patents cover mounting devices designed to hold car accessories, such as computer screens and Global Positioning System units, in place. Palmetto, a South Carolina company, began selling its rival mounting device, the Lobstermount, in 2004.

ORDER – 1

The first patent-in-suit, United States Patent No. 6,561,476, issued May 13, 2003 ("the '476 Patent"), covers a "Positively-Positionable Mounting Apparatus." The patent describes a device with a ball-and-socket mount at one end, a positively-positionable mount at the other, and a coupler that simultaneously grips both ends of the device. One key aspect of the invention is that the coupler has a multisided collar at one end that wraps around an axle with a polygonal (rather than round) surface. This arrangement allows a user to "click" – i.e., positively position – the device into one of several fixed positions, without slippage. Prior known couplers, employing friction, tend to slip under load.

Pursuant to 35 U.S.C. § 254,[1] the United States Patent and Trademark Office ("PTO") issued a Certificate of Correction ("Correction") for the '476 Patent on October 11, 2005. NPI filed this lawsuit in March of 2005 for past and continuing infringement. Compl. ¶ 14. For NPI's causes of action arising before its issuance, the Correction is not effective. Southwest Software, Inc. v. Harlequin Incorporated, 226 F.3d 1280, 1295 (Fed. Cir. 2000). Thus, the court's construction of terms in the '476 Patent as originally issued controls for allegations of infringement that pre-date the Correction. The parties should not assume that such term construction controls for any cause of action arising post-Correction.

---

[1] Section 254 reads, in relevant part: "[w]henever a mistake in a patent, incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the records of the Office, the Director may issue a certificate of correction stating the fact and nature of such mistake, under seal, without charge, to be recorded in the records of patents. . . . [S]uch certificate shall be considered as part of the original patent. Every such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions for *causes thereafter arising* as if the same had been originally issued in such corrected form." 35 U.S.C. § 254 (emphasis added).

ORDER – 2

The second patent, United States Patent No. 6,666,420, issued December 23, 2003 ("the '420 Patent"), covers a "Suction Cup Having Compact Axial Installation and Release Mechanism." The suction cup invention enables a user to increase and decrease the amount of vacuum pressure inside the cup which, in turn, allows for easy repositioning.

In the first step toward deciding NPI's infringement allegations, the court must now construe the meaning of the terms within the asserted claims.

### III.  ANALYSIS

Almost ten years ago, the Supreme Court in <u>Markman v. Westview Instruments, Inc.</u> placed sole responsibility for construing patent claims on the court. 517 U.S. 370, 372 (1996). Subsequent authority established that the court construes claims purely as a matter of law. <u>Cybor Corp. v. FAS Tech., Inc.</u>, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (applying de novo review to all claim construction issues, even "allegedly fact-based questions"). Executing the <u>Markman</u> mandate requires a court to rank the importance of various sources of evidence of claim term meaning and consider them accordingly.

Intrinsic evidence, which includes the patent and its prosecution history, is the primary source from which to derive a term's meaning. <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). A patent is composed of three parts: (1) a "written description," which includes an often lengthy exposition of the background of the invention, at least one embodiment of the invention, and other written material that assists in understanding how to practice the invention; (2) (in most cases) a set of drawings that illustrates portions of the written description; and (3) the claims, which delimit the scope of the invention. <u>General Foods Corp. v. Studiengesellschaft Kohle mbH</u>, 972 F.2d 1272, 1274 (Fed. Cir. 1992). Together, these three components make up

the patent's "specification."[2] Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1384 (Fed. Cir. 1999); 35 U.S.C. § 112. The prosecution history exists independently of the patent. It consists of the inventor's application to the PTO and all correspondence between the PTO and the inventor documenting the invention's progress from patent application to issued patent. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In its review of intrinsic evidence, the court begins with the language of both the asserted claim and other claims in the patent. Phillips, 415 F.3d at 1314; Biagro Western Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary that claim construction begins with, and remains focused on, the language of the claims."). The court's task is to determine the "ordinary and customary meaning" of the terms of a claim through the eyes of a person of ordinary skill in the art on the filing date of the patent. Phillips, 415 F.3d at 1313 (quoting Vitronics, 90 F.3d at 1582).

The court must read claim language, however, in light of the remainder of the specification. Id. at 1316 ("[T]he specification necessarily informs the proper construction of the claims."). The specification acts as a "concordance" for claim terms, and is thus the best source beyond claim language for understanding claim terms. Id. at 1315. The inventor is free to use the specification to define claim terms as he or she wishes, and the court must defer to an inventor's definition, even if it is merely implicit in the specification. Id. at 1316 ("[T]he inventor's lexicography governs."), 1320-21 (noting that a court cannot ignore implicit definitions). The court should "rely heavily"

---

[2] Although 35 U.S.C. § 112 includes the claims as part of a patent's specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims. In most cases, the context of the discussion reveals what portion of the specification is at issue.

ORDER – 4

on the specification in interpreting claim terms. Id. at 1317. In doing so, however, it must walk a tightrope between properly construing the claims in light of the written description and the "cardinal sin" of improperly importing limitations from the written description into the claims. Sci Med Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001); Phillips, 415 F.3d at 1323 (citing Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)).

Although a patent's prosecution history is also intrinsic evidence, it is "less useful for claim construction purposes" because it usually "lacks the clarity of the specification." Id. at 1317. The prosecution history is useful, however, in determining when an inventor has disavowed certain interpretations of his or her claim language. Id.

Finally, the court can consider extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." Id. (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995)). Extrinsic evidence is usually "less reliable than the patent and its prosecution history" as a source for claim interpretation. Id. at 1318. The court thus need not admit extrinsic evidence, but may do so in its discretion if intrinsic evidence does not disclose the meaning of a claim term. Id. at 1319; Vitronics, 90 F.3d at 1583 ("[W]here the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.").

In this case, the parties have cited two kinds of extrinsic evidence: dictionary definitions of claim terms and expert testimony. For the majority of disputed claim terms, the intrinsic evidence is sufficient to either confirm that the inventor used the term in its ordinary sense or to reveal the precise departure from the ordinary meaning that the inventor intended. As such, the court discusses dictionary definitions only where necessary and declines altogether to rely on Palmetto's expert in construing the terms. See Trilogy Communications, Inc. v. Times Fiber Communications, Inc., 109 F.3d 739,

ORDER – 5

744 (Fed. Cir. 1997) ("When . . . the patent specification and the prosecution history adequately elucidate the proper meaning of the claims, expert testimony is not necessary and certainly not crucial.").

With this general framework in mind, the court turns to the claim terms in dispute.

**A.    Construing The Term "Wheel-and-axle assembly" in the '476 Patent**

The term "wheel-and-axle assembly" means an assembly formed from the arm member's multisided part collar in cooperation with the multisided positional mount.

Claims 1, 5, and 11 cite two elements that cooperate to form a wheel-and-axle assembly: a "multisided part collar" and a "multisided positional mount." Claim 5 further specifies that a multisided positional mount is comprised of a disc-shaped wheel portion and multisided axle portion. From here, Palmetto contends that the definition of wheel-and-axle assembly must include a "concentrically mounted disk portion" in addition to the multisided part collar and multisided positional mount.

The court adopts NPI's interpretation that the "wheel-and-axle assembly" requires nothing more than what the inventor claims: a multisided positional mount and a multisided part collar. Biagro, 423 F.3d at 1302 ("claim construction begins with, and remains focused on, the language of the claims."). Here, only Claim 5 imparts a limitation that the wheel-and-axle assembly must also include a disc-shaped wheel portion. Claims 1 and 11 make no mention of such an element. Given that each claim in a patent is presumptively different in scope, the court declines to construe Claims 1 or 11 to contain a limitation expressed only in Claim 5. Comark, 156 F.3d at 1186-87. Here, the "disc-shaped wheel portion" is an optional element, but not necessary to define a wheel-and-axle assembly.

ORDER – 6

The inclusion of a "disc-shaped button or wheel portion" in describing one embodiment of the assembly does not change this result. At the outset, the court notes that the inventor need not describe all possible forms in which the claims may be reduced to practice. Gart v. Logitech, Inc., 254 F.3d 1334, 1342 (Fed. Cir. 2001) (noting that "drawings [depicting the preferred embodiment] are not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims themselves."). What is more, the written text and figures describing a particular embodiment should be read in light of the specification as a whole. Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 724 (Fed. Cir. 2002) ("this court does not construe the figures depicting a single preferred embodiment as limiting the claim terms in light of other language in the written description embracing other . . . structures.").

Here, Figures 3A and 3B illustrate one embodiment of a wheel-and-axle assembly formed of the positively-positionable mount formed on a mounting base. The figures include a depiction of a positively-positionable mount shaped like a mushroom, which includes a "disc-shaped button or wheel portion." '476 Patent, col. 3, lines 56-58. To paraphrase NPI, this button or wheel acts as a "stopper," NPI Brief at 9, to ensure that "the arm members of the coupler . . . can obtain a suitable grip [around the axle]." Id., col. 4, lines 4-7; see also, id., col. 4, lines 31-35 (describing same). Despite this stated objective, the drawings do not include the coupler's rigid arm members (of which the multisided collar is part). The accompanying description to the Figures, however, explicitly references the arm members and directs the reader to further discussion that follows. '476 Patent, col. 4, lines 4-7. Not only does the court refuse to read Figures 3A and 3B in isolation from the remaining written description, Beckson, 292 F.3d at 724, but the inventor expressly instructs against it. Indeed, throughout the specification, the inventor describes the coupler's rigid arm members in relative orientation to the

ORDER – 7

multisided positional mount's multisided axle portion.  E.g., id., col. 4, lines 20-25; id., col. 5, lines 4-8; col. 6, lines 18-21.  Thus, the fact that Figures 3A and 3B include a disc-shaped wheel portion and omit the multisided collar is not dispositive in light of the surrounding written description and the clear language of the claims themselves.

**B.   Construing Terms in the '420 Patent**

   **1.   "An aperture communicating between . . ." and a "second opening communicating between . . ."**

"[A]n aperture communicating between the housing drive surface and the recess" means an opening through the housing where the housing drive surface is aligned with the recess.  A "second opening communicating between the concavity and the external reaction drive surface" means an opening through the housing where the housing drive surface is axially aligned with the recess.[3]

The parties present identical arguments for both of the above terms, found in Claims 1 and 15, respectively.  Palmetto contends that, in both instances, "an aperture" or "opening" means a single hole and that "communicating between" refers to providing a direct connection between two surfaces.  NPI argues that the claims are not limited to a single opening and that the communication between the two surfaces need not be direct.  The parties do not dispute that aperture means opening and vice versa.

For both terms, the claim language and specification do not exclude the possibility of more than one opening or aperture.  First, both Claims 1 and 15 use the transitional phrase "comprising" in their respective preambles.  "Comprising" is an open-ended term which creates a presumption that the invention is made up of at least as many elements as described.  Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367,

---

[3]The court's construction of the terms adopts those provided by NPI in the Amended Joint Claim Chart (Dkt. # 49).

ORDER – 8

1371-73 (Fed. Cir. 2005) (holding that "comprising . . . a group of first, second, and third blades" in patent for safety razors encompassed a four-bladed razor). Moreover, the use of the article "an" before "aperture" in Claim 1 tends to suggest the possibility of more than one such opening. Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 977 (Fed. Cir. 1999).

Claim 15 assigns an ordinal to the aperture element: "a *first* opening on the surface [of the housing concavity]. . . and a *second* opening communicating between the concavity and the external reaction drive surface . . . ." '420 Patent, col. 13, lines 4-6 (emphasis added). The court construes the numbering in this instance as merely differentiating between multiple references to an element; as such, the term "second" does not confine the claim to include only one such opening. See Innovative Props. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("use of the terms 'first' and 'second' is common patent-law convention to distinguish between repeated instances of an element" and should not necessarily be interpreted to impose a serial limitation on a claim).

Without intrinsic support, Palmetto argues for an additional limitation that the opening's "entire purpose" is to provide a *direct* connection between two surfaces. Palmetto Resp. at 5. The specification teaches, however, that the purpose of the aperture is to allow for a drive shaft to pass through, a point which Palmetto conceded at oral argument. '420 Patent, col. 4, lines 66-67; '420 Patent, col. 4, lines 28-31. There is no indication from the claim language or the specification that such purpose must be met via a pathway that provides a direct connection between the housing recess and the external reaction drive surface. Both Claims 1 and 15 refer to an opening that simply communicates between two "aligned" surfaces. '420 Patent, col. 11, line 8; id., col. 13, line 6. Palmetto's dictionary definition appears to undermine its argument:

ORDER – 9

"communication" is a "means of connecting different places, such as a door, passage, road, or railway." The Concise Oxford Dictionary 268 (9th ed. 1995). By this definition, an aperture could provide a means for connecting two surfaces via a direct pathway or a passage that spans two distant places. Accordingly, the court declines to adopt Palmetto's limitations.

### 2. "[A] drive shaft coupled to" and "a drive shaft coupled at one end to a suction cup"

"[A] drive shaft coupled to" means a drive shaft linked with and "a drive shaft coupled at one end to a suction cup" means a drive shaft with an end portion linked to a suction cup.

The parties dispute whether the term "coupled," found in Claims 1 and 15, describes a connection between two distinct parts. Palmetto argues that the suction cup and drive shaft are two separate features, while NPI contends that the two can exist as an integrated piece.

The court declines to read a limitation into the broad term "coupled." See Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P., 326 F. Supp. 2d 1060, 1077 (C.D. Cal 2003) ("[O]ne of ordinary skill in the art understands the term 'coupled' to connote a broad range of associations between two things."). The parties agree that the ordinary use of the term means to join or link together. It does not follow that the term necessarily implies the physical joining of two separate components. Id. at 1078; see Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 992 (Fed. Cir. 1999) (holding that "coupled" does not necessarily require a mechanical or physical coupling). Indeed, one embodiment in the specification indicates a drive shaft and suction cup "integrally" molded of the same material. '420 Patent, col. 7, lines 12-18. Even so, Palmetto argues that these "few lines" from the specification contradict the clear language of the claims. Palmetto Resp. at 6-7. Thus, according to Palmetto, the

ORDER – 10

inventor may have disclosed such an embodiment, but failed to claim it. The court disagrees. There is no contradiction between the specification and the claim given the broad definition of the term "coupled." The court rejects Palmetto's veiled attempt to limit the claim in such a way as to exclude one embodiment. See Vitronics, 90 F.3d at 581 (an interpretation that would exclude an embodiment "is rarely, if ever, correct").

### 3. "Spiral installation drive surface"

"Spiral" means a three-dimensional curve that turns around an axis at a fixed or varying distance.

The parties do not dispute the meaning of "installation drive surface." The dispute is whether the term "spiral," found in Claim 1, means rounded or helical.

The court concludes that spiral is used according to its ordinary definition, cited above. The term helical is impermissibly narrow; a helix describes a *type* of spiral that turns around an axis at a constant diameter, whereas the term spiral can also encompass a three-dimensional curve that turns around an axis at a varying distance. Palmetto attempts to narrow the definition by citing what appear to be helical drive surfaces depicted in Figure 4. There is no indication that the patentee intended the claims and the embodiments to be strictly coextensive; rather, Figure 4 is exemplary in nature. '420 Patent, col. 7, lines 19 (illustrating "one embodiment"). As such, the court declines to depart from the ordinary meaning of "spiral" and impose a limitation on the term based on one figure disclosed in the specification. Gart, 254 F.3d at 1342; Phillips, 415 F.3d at 1323. As to NPI's proposed definition, the court finds no support in the intrinsic evidence that the patentee intended to act as his own lexicographer in defining "spiral" to mean round.

ORDER – 11

### 4. "Lip portion sized larger than the first opening" and "the peripheral lip portion projecting beyond the first opening thereof"

A "lip portion sized larger than the first opening" means a portion of the suction cup sized to project beyond the first opening of the housing; and "the peripheral lip portion projecting beyond the first opening thereof" means the peripheral lip portion of the suction cup extending beyond the first opening of the housing.

For both terms, Palmetto contends that "sized larger" and "projecting beyond" should be limited to mean that the outer lip of the suction cup is obviously larger to a "non-expert observer."

There is no intrinsic evidence to support Palmetto's proposed limitation on these two terms. The specification teaches that the purpose of sizing the outer lip larger than the opening is so that the suction cup can properly come into contact with the surface to which it attaches. '420 Patent, col. 6, lines 60-65 ("the lip portion . . . of the elastically resilient material [is] structured to . . . keep[] the peripheral lip from being drawn into the concavity"). There is no basis for limiting *how much* larger the suction cup lip must be, just that it is sized in such a way that it does not get drawn into the housing. Palmetto attempts a common sense argument that "as a matter of simple physics" the lip portion of the suction cup must be obviously larger than the housing to perform its job. Palmetto's Resp. at 8. Nothing in the intrinsic evidence supports this limitation of an "obvious" size differential; indeed, common sense just as easily suggests that a person practicing the invention could fashion the lip portion behind another structure or so finely calibrate the cooperating or integrated elements such that sizing is not at all obvious to the observer. The court rejects Palmetto's proposed limitation and adopts NPI's construction, which tracks the claim language.

**5.    "Means engaged between the distal portion of the plunger drive shaft and the annular installation drive surface for drawing the plunger drive shaft outwardly"**

The parties agree that this term requires a means-plus-function analysis pursuant to 35 U.S.C. § 112.  The parties also substantially agree that the function is just what is stated in the claim: to "draw[] the plunger drive shaft outwardly through the second opening in the housing when the rotational drive member is rotated in a first direction relative to the external reaction drive surface."  '420 Patent, col. 13, lines 31-32; col. 14, lines 1-2.  The court adopts this cited function.

The parties disagree as to what structure fulfills this function.  NPI contends that the structure is limited to whatever is found between the drive shaft and the annular installation drive surface.  Palmetto contends that the necessary structure involves a minimum of three parts: (1) a drive pin, (2) a hole in the plunger drive shaft, and (3) a helical ramp surface.

When construing a means-plus-function claim, the court must hunt in the specification for the structure that fulfills the stated function.  <u>Micro Chem., Inc. v. Great Plains Chem. Co.</u>, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999).  The court must interpret such a claim to encompass "*all* structure in the specification corresponding to that element and equivalent structures."  <u>Id.</u> (emphasis added).

The court concludes that the corresponding structure necessary to fulfill the cited function is an installation drive pin, a hole in the plunger drive shaft, and a spiral installation drive surface.  '420 Patent, col. 3, lines 5-10 (describing a drive shaft with a means for interacting with the spiral installation drive members to move the drive shaft outwardly); <u>id.</u>, col. 6, lines 43-47 (describing a hole in the drive shaft for the installation drive pin); <u>id.</u>, col. 9, lines 24-26 ("During rotation, the installation drive pin comes into contact with a upwardly ramping axial installation drive surfaces."); <u>id.</u>, col.

ORDER – 13

9, lines 42-46 ("In effect, motion of the installation drive pin upwardly along the installation drive surfaces pulls the drive shaft of the plunger and out of the concavity").

NPI conceded at oral argument that a drive pin could not alone pull the plunger drive up when the drive member rotates. Nevertheless, NPI argues that the court should confine its search for the necessary structure to a particular location; namely, whatever is between the drive shaft and the installation drive surface. The court is not aware of, nor does NPI cite, any authority that indicates that the court should disregard necessary structure simply because the claim language discloses *some* structure. Indeed, disclosure of some structure does not preclude applicability of traditional means-plus-function analysis; it may, as here, simply set the context for describing such function. Laitram Corp. v. Rexnord, Inc., 939 F.3d 1533, 1535 (Fed. Cir. 1991).

### 6. "Means for securing the plunger drive shaft in fixed rotational orientation to the annular installation drive surface"

Again, the parties agree that this term requires a means-plus-function analysis and generally agree as to the stated function. The court concludes that the function is to secure the rotational orientation of the plunger drive shaft relative to the annular installation drive surface.

The court concludes that the structure necessary to perform the stated function is: a drive pin, or equivalent, and a positional keeper portion of the rotational drive member, such as a detent saddle that engages the pin. For near identical reasons as stated above, the court rejects NPI's proposed construction that seeks to exclude some of the necessary structure to perform this function. The specification provides that a saddle operates as the "anti-rotation locking mechanism." '420 Patent, col. 7, lines 48-49. In

ORDER – 14

turn, "[i]rrespective of configuration, the installation drive and [sic][4] rests on the shelf portion." id. That is, as stated by Palmetto at oral argument, the detent saddle "seats" the drive pin. A detent saddle alone does nothing in the way of performing a function without cooperation with some *other* element. NPI admits as much in its brief when it states that the saddle "serve[s] to catch the drive pin or other drive shaft engagement means at a particular angle of rotation." NPI Brief at 23. As such, the court largely adopts Palmetto's proposed structure: a drive pin, or equivalent, and a positional keeper portion of the rotational drive member, such as a detent saddle that engages the pin.

## IV. CONCLUSION

This order concludes the claim construction process for the disputed terms before the court. As stated above, the court's construction of the terms in the '476 Patent as originally issued controls for allegations of infringement that pre-date the Certificate of Correction issued on October 11, 2005. At this time, if the parties wish to amend their allegations of infringement or invalidity based on the recently filed Correction, the court directs the parties to consult the court's original scheduling order in this matter, which requires the asserting party to show "good cause." (Dkt. # 27 at 4). The moving party should accompany such a request with a proposed revised case schedule, which the court will note for consideration seven judicial days after filing. Local Rules W.D. Wash. CR 7(d)(2)(A).

Dated this 4th day of May, 2006.

s/James L. Robart

_____
JAMES L. ROBART
United States District Judge

---

[4] The "installation drive" term in this clause references element 42, which is uniformly referred to as an "installation drive pin" in the remainder of the specification.

ORDER – 15